## McCandless v. Maguire et al.

*Metzger & Wickersham,* for plaintiff.
*Hull, Leiby & Metzger,* for defendants.

NEELY, J., April 23, 1951.—This is an action in trespass arising out of a collision of defendant's bus with the abutment of a bridge, as a result of which plaintiff sustained injuries. The matter is before us on defendants' motion for a new trial. Their motion for judgment n. o. v. has been abandoned. The jury brought in a verdict in favor of plaintiff in the total amount of $29,551.25, itemized as follows: $51.25 for medical expenses, $9,500 for pain and suffering, and $20,000 for loss of earning power.

In support of their pending motion, defendants maintain that the court erred in admitting testimony concerning plaintiff's earnings with Westinghouse Air Brake Company, in Pittsburgh, and also in submitting to the jury the question of the loss of plaintiff's earning power. It is further claimed that the amount of the verdict is excessive.

Defendants operate a bus line as a common carrier. Plaintiff on the night of September 17, 1944, was a paid passenger on defendants' bus. He was in the Army at the time stationed at the Indiantown Gap Military Reservation. He boarded the bus at the reservation to come to Harrisburg at about midnight. According to plaintiff's testimony, while the bus was being operated on U. S. Highway Route 22, and as it was approaching the locality known as Manada Hill in this county, traveling at a speed of 45 to 50 miles per hour,

it struck the abutment of a bridge. Plaintiff was thrown against the upright between the windows on the right side of the bus. He was rendered temporarily unconscious. When he regained his senses shortly after the crash, he had a cut on the left side of his forehead and was bleeding from this cut.

Plaintiff boarded another bus unassisted which took him and others to the Harrisburg Hospital. He was able to enter the hospital without assistance. He was given a hypodermic, and after several stitches were taken to the cut in the forehead he left the hospital and "hitch hiked" to his home in Pittsburgh. He arrived in Pittsburgh at 9 o'clock in the morning of the same day on which the accident occurred, slept until the afternoon, and then returned to the military reservation. He testified that he was in bed one week at the reservation. He was there given sedatives from time to time and the stitches were removed. Plaintiff's testimony is that certain of his front teeth were loosened in the accident.

Before going into the Army, plaintiff was a musician, a trombone player. In the Army he likewise played the trombone in various musical organizations in this country and overseas. He was attached to a band at Indiantown Gap at the time of the accident. After the accident he was sent to other stations in this country. Pursuant to his own request, he was transferred to the infantry, and in that branch of the service was sent to the Pacific Theatre in the first part of 1945. He served in several areas in the Pacific and was finally transferred to the Two Hundred and Thirty-third Army Ground Forces Band in Manila. Plaintiff went to Japan with that organization, and then subsequently was shipped home in the first part of March 1946. He was mustered out April 6, 1946.

Plaintiff called Dr. Paul H. Franklin, who examined him after he was out of the Army, and more than four

years after the accident. The physician testified that plaintiff had suffered a permanent brain injury. He based this diagnosis on the fact that a certain test known as the "Romberg test" had proven positive. He also testified that he had given plaintiff a complete neurological examination. However, Dr. Charles W. Smith, called by defendants, disputed the validity of the Romberg test for the purpose of determining a brain injury. Dr. Smith testified that such test was only for the purpose of ascertaining whether or not there was an injury to the central nervous system. Plaintiff did not refute Dr. Smith's evidence as to the invalidity of the Romberg test with respect to determining a brain injury. Since Dr. Franklin predicated his testimony that plaintiff had a brain injury on the Romberg test, made more than four years after the accident, he should have at least shown that the test was recognized as a valid test for the purpose used.

There was sufficient testimony from which the jury could have found that plaintiff's teeth were loosened in the accident on the basis of the evidence given by plaintiff himself: Ross v. Riffle, 310 Pa. 176 (1932) ; Paul et al. v. Atlantic Refining Co., 304 Pa. 360 (1931) ; Grebe et al. v. Kligerman, 310 Pa. 60 (1933). Dr. Albert Goho testified that plaintiff's loosened teeth would render it difficult for him to play wind instruments. Defendants' witness, Dr. Harding, testified that the loosening of the teeth was due to malocclusion rather than any accident.

In addition to his loose teeth, plaintiff testified that his present injuries are headaches and that he feels weak. The evidence concerning these additional ailments is almost entirely based upon plaintiff's subjective symptoms, except that his doctor testified that he had low blood pressure. Plaintiff's evidence concerning these subjective symptoms must certainly be weighed in

the light of his arduous military duties which he performed in the Army long after the accident.

Plaintiff testified that he "worked for Westinghouse Air Brake" in Pittsburgh for approximately two years before going into the Army, and that he terminated his employment in April of 1943 or February of 1942. Plaintiff stated that the employment was terminated in 1942, but acquiesced in counsel's suggestion that it could have been 1943. He testified that his earnings at Westinghouse were $60 per week. Also while working there he had special musical engagements to play in an orchestra at the Westinghouse Radio Station KDKA in Pittsburgh, and in these engagements he made from $9 to $14 per week extra. In the spring and summer of 1943, when he was expecting to be drafted, he had two intermittent engagements with a professional orchestra, in which he earned approximately $76 per week. These latter two engagements were not of lengthy duration.

Plaintiff testified that after he was discharged from the Army he endeavored to obtain work with professional orchestras, but could not meet their requirements because his loosened teeth prevented him from applying the requisite pressure to play a trombone in these orchestras. He said that a different type of music was played in the Army, and that he was qualified to do that, but he could not give the instrument the required pressure in civilian life, due to his loose teeth. He went to work for his father in the clothing business in the Pittsburgh area and made from $20 to $25 per week. His father said that his work was unsatisfactory. His wife testified that when he got out of the Army he was an "old man" and irritable.

Defendants' first objection is that we admitted evidence that plaintiff was earning an average of $60 per week at Westinghouse Air Brake Company. As we understand defendants' objection, it was based on the

proposition that the earnings were too remote to have any probative value. The rule undoubtedly is that evidence of what a man was able to earn at his regular occupation a reasonably brief time before an injury, may be taken into consideration by a jury, along with other evidence, for the purpose of determining what his earning power was before the injury. It is true also that what a person earned several years before an accident possesses too little probative value to be admitted: Rooney v. Maczko, 315 Pa. 113 (1934). But the instant case involved a man who had entered the Army in November of 1943, 10 months before the accident. Under these conditions, we feel that testimony of what that soldier earned within a reasonable period of time before entering the service could be considered by the jury on the question of his earning power.

In the Rooney case the Supreme Court said that earnings more than five years before the accident should be excluded. But in Wensel v. Standard Supply and Equipment Co., 72 Pa. Superior Ct. 56 (1919), the Superior Court held that evidence of earnings within a year and a half of the accident should be admitted. And on the question of earnings, it is interesting to note that defendants did not object to the plaintiff's auxiliary earnings at Radio Station KDKA, and that those earnings were current with his employment at Westinghouse Air Brake Company. We feel that the testimony was properly admissible.

We would not have been justified in taking from the jury the question of the loss of plaintiff's earning power. The loss of earnings usually is the means by which the loss of earning power is established. However, the Supreme Court in Saganowich et al. v. Hachikian, 348 Pa. 313 (1944), held that the loss of earning power could be shown even though there was no actual loss of earnings. The court said, at page 316:

". . . Damages for loss of *earning capacity* arise out of an impairment of that capacity, and not out of loss of *earnings*. The earnings of the plaintiff subsequent to the injury, as compared with his earnings at the time of the injury, are merely evidence, but not conclusive evidence, as to whether his earning power has been diminished by the accident."

The essential question is whether there has been an impairment in the capacity to earn. There is evidence of plaintiff's musical activity extending over a period of four years or more. Whether the injuries which plaintiff sustained, particularly the loosening of his teeth, did in fact impair his capacity to earn money because of his inability to play the trombone in professional orchestras, we feel was a question for the jury under all the evidence in this case. Also, the jury had the right under the evidence in the case to consider the earnings at the Westinghouse Air Brake Company as bearing upon the question as to whether or not there had been any impairment of his earning capacity. There having been testimony as to plaintiff's general inability to work upon his return from the Army, plaintiff had the right to establish his earning power by showing several employments: Kenmuir v. Pittsburgh, 347 Pa. 156 (1943) ; DeHaas v. Pennsylvania Railroad Company, 261 Pa. 499 (1918).

We endeavored to protect the rights of the respective parties by instructing the jury to consider the probable duration of plaintiff's usefulness as a musician, and the reasonable and probable length of time that he could expect such employment. We feel that the jury misapplied the law, or was influenced by considerations that were not pertinent to the issues involved herein. But we cannot for that reason conclude that we were in error in submitting to them the question of the loss of earning power.

Defendants claim that this verdict was excessive. In our opinion, the evidence will not sustain the verdict in the amount rendered. Plaintiff's evidence as to his personal injuries is not consistent with his activities in the Army following this accident. It is to be noted that plaintiff's condition at the time of the trial depends almost entirely upon the subjective symptoms which he says he experiences at the present time, except as to his loosened teeth.

The real emphasis in this case was placed by plaintiff on the loss which he claims to have suffered as a musician. The record shows that as a musician, plaintiff's employment was sporadic, and that rather than steady employment with one orchestra, he had intermittent employment. This is an important fact that must be considered as bearing on the question of the excessiveness of the verdict. We left it to the jury to determine how long this plaintiff could reasonably expect to earn money as a professional musician playing in professional orchestras. Youth is an important consideration. And we must now bear in mind these elements in considering the propriety of the amount of this verdict, and we must also bear in mind that the evidence shows that plaintiff's employment as a professional musician was irregular and not over an extended period of time. In determining whether this verdict was excessive, we should bear in mind that the medical expenses incurred by the plaintiff amounted to $51.25. We must also consider the evidence concerning the extent of the physical injuries sustained in the accident, and plaintiff's continued activity after the accident.

In Brown v. Paxton, 332 Pa. 260 (1938), in determining whether or not a verdict was excessive, the Supreme Court said, at page 263:

". . . It is apparent that she (plaintiff) was able, after a delay of twenty minutes, and without receiving

medical treatment, to continue her journey in the automobile to a distant city; that her injuries were not such as to prevent her from performing her usual duties as a teacher; that no treatment, except sedatives, was prescribed for her for several weeks by the physicians whom she consulted upon returning to her home.

". . . There was no medical evidence before the jury of the actual condition of plaintiff followng the accident, as the physicians who testified for her based their opinions upon the subjective symptoms which she related to them many months thereafter."

See also Gail v. Philadelphia, 273 Pa. 275, 278 (1922) ; Anstine v. Pennsylvania Railroad Company et al., 52 Dauph. 372 (1942) ; Tauber v. Wilkinsburg, 309 Pa. 331 (1932) ; Figlarowicz et al. v. Somerset Electrical Company, Inc., et al., 360 Pa. 586, 588 (1949) ; Durdella v. Trenton-Philadelphia Coach Co., 349 Pa. 482, 484 (1944) ; Libengood et al. v. Pennsylvania Railroad Company, 358 Pa. 7, 12 (1947) ; 46 A.L.R. 1416; 102 A.L.R. 1564.

Proper compensation for injuries of this type is indeed difficult to determine. We feel, however, that the verdict in this case was excessive and was not based upon the law and the evidence in the case. Accordingly, a new trial will be granted unless plaintiff, Russell F. McCandless, within 15 days from the date of this order, remits the sum of $22,551.25.

And now, April 23, 1951, defendants' motion for new trial is granted unless plaintiff shall, within 15 days of this date, remit $22,551.25 of the verdict. Upon filing a remittitur of that amount and payment of the jury fee, the motion for a new trial is overruled and judgment is directed to be entered in favor of the plaintiff upon the verdict as remitted, in the sum of $7,000.

Rupp, P. J., did not participate in this opinion.